Your Honor, the second case on this morning's call, 209-77, State Bank v. Paul Cheeseman and all, on behalf of the appellant, Mr. Robert Lindstrom. On behalf of the appellee, Mr. Robert C. Thurston. Mr. Lindstrom. You may proceed. Thank you. May it please the Court. Good morning. Good morning. This is a breach of contract case. My client, the plaintiff, Appellate State Bank of Freeport, Illinois, is seeking to collect some accounts receivable that were pledged to it as security for two loans made to a grain elevator called the Grainery, formerly doing business in Lanark, Illinois. The Grainery went out of business and the bank is now pursuing its collateral. We filed a complaint in Carroll County. The defendants filed a 2615 motion to dismiss, which was granted. We thought we complied with the Court's directive and timely filed a First Amendment complaint. However, the defendants' 2615 motion to dismiss that complaint was granted with prejudice. We believe the Court erred in granting the motion to dismiss, and that's why we're here today. Was that the fourth complaint that was filed alleging these basically were the same contract action? No. And that's one of the disputes Mr. Thurston and I have here, obviously, in the brief. We initially filed complaints against a number of grain producers as a result of the failure of the Grainery, including the present defendants. That was back in 2001. In that matter, we filed a complaint, which was initially dismissed. We refiled a First Amendment complaint, and the defendants, including the present defendants here, all answered that complaint, including affirmative defenses. The matter progressed forward a bit, and we chose to voluntarily dismiss the action. The defendants did not oppose that, and we followed Illinois law in voluntarily dismissing. We then refiled within the one-year period against the current defendants in this matter, and so we have filed a complaint and a First Amendment complaint only in this case, which we believe is a completely new action, and what happened in 2001 is irrelevant. And there are statements in there about multiple filings, trying to state a cause of action three, four, or five times, and we don't believe that's accurate at all. The 2001 complaint and then the First Amendment complaint filed thereafter alleged these same contracts, did they not? Yes, they did. And basically the same allegation that the bank overpaid the grain producers, correct? Yes, they did. The only difference is in 2001 there were more defendants, and when we refiled a year later, we only filed against these individuals here. If the contracts provided that the farmers were to receive 80 percent of what might have been agreed to between the parties, how did they get overpaid? Well, they sold the grain, they delivered the grain, and they were paid through the terms of the contract a certain percentage in advance. The remainder then was going to be priced in the future, which is totally appropriate. The contracts follow Illinois law. The Department of Agriculture regulates these matters, including the terms of the contracts. So what they were doing at that point was, in a way, I guess, playing the market. If the market went up, then through the terms of the contract, they would gain an additional sum for the sale of their grain. The problem that can result is if the market goes down, which it did here, then they could end up being paid too much. Or put another way, the granary might have made more money. I'm sorry? Or put another way, the granary might have made more money. Well, at the end of the day, I suppose, yeah, that they would have not overpaid, very definitely. But what we find here is, and I think it's significant, is at least two of these defendants, Mr. Cheesman as well as Terry Dahmer, used these same contracts to file a claim with the state of Illinois in the administrative proceeding when the granary failed, wherein they were seeking to be paid money out of this field. Did they allege a particular date to determine what the going price of the grain was? Did they? Yes, they would have, yes. But the Illinois Department of Agriculture. Do you know what that date was? I don't, Your Honor, no. Okay. Why did you pick the date that you picked? The date we picked is twofold. One is we went through the same procedure. We followed what the state of Illinois did. And, in fact, Cheesman and Dahmer are the best example. They reviewed the contracts. They reviewed the terms and said you're not owed any money, gentlemen. In fact, you owe money to the granary. And between the two of you, you owe $215,000. And that's exactly what we filed suit against those two individuals for. The Department of Agriculture has an administrative rule that they follow when an elevator fails as to how they determine unpriced grain is priced on the date of the failure. That's what the state of Illinois did in their administrative proceeding. We followed their procedures exactly so they're hand-in-hand. And if this matter came to trial, proving what the price would be, frankly, we would follow that procedure so we would be consistent with that. Are accounts receivable usually recoverable under account-stated law or under some other type of law? I think they could be. In this case, obviously, we filed suit as part of our security agreement as accounts receivable. I believe that at some point in time you alleged something about the State Department of Agriculture or their rates or something like that as a basis upon which recovery could be affected. Is that correct? Yes. We believe we set forth a legally sufficient claim for breach of contract. But you didn't do that the first or second time, did you? It was until later that you raised that. Am I right or wrong? The Illinois price? We were trying to explain that. And, frankly, I don't think that that's part of a 2-6-15 motion. It was raised in the motion to reconsider. And as this case evolved, I was pressed more and more to describe the terms of the contract in more detail than I think the trial court should do in looking at a 2-6-15 motion. I think they only look at the face of the complaint, and did I allege a price in there? Certainly we did. I think it's a factual issue as to how we came up with that price.  Are you suggesting that the motion was more in the nature of a motion for summary judgment? Frankly, I think Judge Springermeier, his findings and opinion, if you read it, it looks like it's a ruling of that nature, yes. I think he considered all kinds of things other than looking at defects on the face of the complaint. Well, if he ruled in your favor, then he apparently was saying that based upon what he sees, you haven't presented an arguable claim that you're entitled to relief. Would that be correct to say? He did. While he did that, he also went to the extent of making the statement in there that we've shown a valid enforceable security interest. And while I think we certainly have one, I don't believe that that's something for the court to rule on in a motion to dismiss under 2-6-15 either. I think he was looking at it other than looking for a legally deficient complaint on its face. And he was looking at things other than he should have been looking at. Were there alleged contracts attached as exhibits to the complaint? On the First Amendment, they were. On the initial complaint, they were not. I don't know if it's important or not. It's not in the record. But I thought I had a gentleman's understanding with counsel at that time that I would not attach them because, as Your Honors can see, they're very voluminous and the court file is expanded. So I filed it without it. Well, if they attach these exhibits by stipulation or otherwise and they exhibit gibberish, then isn't there a problem? Well, I don't think they exhibit gibberish. Well, they apparently had an awful lot of markings on them that were either illegible or undecipherable, or were they? Well, the copies of the contracts attached to the First Amendment complaint do have markings on them. It's been our position all along that those markings mean nothing, that looking at the attached written amendments show what evolved as the contracts were rolled forward, or, as you will, they kept moving forward as the producer was trying to get a greater price. But in addition to that, we have attached in the complaint we've tendered with the motion to reconsider copies of the same contracts, which are clean, which were in the possession of these defendants that don't have those markings, and that's one of the bases why we think the court erred in dismissing with prejudice. If the court was alarmed with the markings on there, then we can certainly refile a Second Amendment complaint with clean contracts that, in fact, these individuals had produced. Are you saying that there are two different forms of written contracts? No. The people who manage the greenery, for whatever reason, when the contracts were rolled, one of the gentlemen marked on it with his notations as to where he thought the contracts were, I guess. But those same contracts were sent properly to the defendants so they knew what was going on, and they didn't make any markings on their contracts because they didn't need to. The written amendments to the contract are what's important here, and the trial court has been, I think, focused improperly on the markings on the front that don't mean anything. Do we wish they weren't there? Of course. But the fact of the matter is the amendments aren't there. Are not some of these markings possibly capable of being interpreted in your favor or in the greenery's favor? They could be, but we view the written amendments as being the better practice, and certainly that's what goes on in the industry where if there is an amendment to the contract, it's printed and a confirmation is sent to the grain producer so both the buyer and seller know what the status of the matter is, and that's what went on here. And I think focusing on the gibberish is something that shouldn't be done. In order to enforce a contract based upon a price to be determined in the future, it normally requires a means by which that future date is readily ascertainable. Could you explain to me how some date in the future could have been readily ascertained based upon the documents that you presented or the alleged contracts? The written amendments set a price at a future date. It's based upon a formula involving the Chicago Board of Trade and the futures, and that fixes the final component of the contract here, whether it's a basis contract or otherwise. Well, did you allege what date that was? And in addition thereto, was there a different date for each contract? We alleged, we attached to the complaint the initial contract. We attached all the amendments. Theoretically, the last amendment would be the price the contract would have set or the seller could have fixed the price based on that last amendment but for the fact that the granary failed. When the granary failed, then the proceedings that the State of Illinois followed to price unpriced grain on a failed grain elevator superseded what's in those contracts. When an elevator fails, there's always unpriced grain, whether they're involved with contracts like these or otherwise. So the state has to have a process to price the grain. That's what they did here. That's the risk that these producers undertook, frankly, by not pricing their grain in total when they delivered the grain. If you get more money for something, typically it means you've assumed the risk and you get a bigger return. But if you assume the risk and the market goes against you, you lose. How do you know that the market went against them if supposedly the date is determined based upon the defalcation of the granary and not necessarily a bad market? I don't believe the defalcation of the granary has anything to do with these contracts. There's nothing in the record to indicate that. I thought you said that when the granary went defunct, then something else kicked in. And the other thing that kicked in was a different date that supposedly would cause them to lose something. So you're telling me, at least I thought you just told me, maybe I misunderstood, that the defalcation of the granary was an incident which altered the window or the number of dates that were possibly capable of ascertainment. Well, these contracts got priced upon the failure of the granary because it failed. And I want to make it, and maybe I'm focusing on something in the brief, because the counsel included in there that the fact that two of the owners were charged with criminal conduct as a result of this, I want to make it clear that that criminal conduct and the documents and the records show they have nothing to do with these contracts. And they were charged with criminal conduct for other matters. And what happened here with these contracts, they were not charged with any criminal activity whatsoever. So I guess I want to make that clear that, yes, the granary failed, and, yes, the grain was priced at that point, but it wasn't because the owners did something with these contracts to disturb them in any way to cause them to be altered. The fact that the price that you're arguing is set by administrative rule, that's not in the complaint, correct? It's not. And you said that the reason you started arguing this was because the judge was pressing you to say, well, how are we going to set the price on this grain? And then you came up with this basically an argument that the way the state did it, we'll go with that way. I mean, is that what happened? On the initial complaint, Judge Springlemeyer simply ruled that he wanted me to attach copies of the bank's documents, notes, security agreement, financing statement that showed we had an interest in the contracts because the contracts were obviously between the granary and the grain producer. So how did the bank get involved? So we attached those. He also asked me to attach copies of the actual contracts. Obviously, the Code of Civil Procedure requires that. I thought I had an agreement with counsel. It was going to be a matter of evidence, and we weren't going to attach them. But in the ruling, I attached them. I filed them the first amended complaint. I thought we were in good shape at that point. We'd move forward again to bring this matter to a conclusion after a full hearing. And I got surprised with this other ruling that went way beyond what I thought we were looking at because he didn't indicate there were any other defects on the complaint whatsoever. And I think that if we allege the existence of a contract and its performance and breach and damages, we've pled a legally sufficient complaint, and we've done that here. But the damages is based on the setting of a final price. I mean, you can't show damages if the final price was, you know, the same amount that they were paid. So, I mean, the damages is based on the final price. And that's what the trial judge was focused on was how do we figure out the final price here. It seems like you somewhat arbitrarily picked June 30th out of all these, at least most of the ones, as the last date for these last sheets, whatever these invoices are. And then that showed up on your kind of tally sheet here. It was June 30th was the final date that you picked. I believe to withstand a 2-6-15 motion, if we allege a price that's due, then that withstands the motion. If it turns out that price is incorrect or there's another price as we proceed ahead as a matter of evidence, then that's what it's going to be. But I think in a 2-6-15. But we're a fact pleading state. I mean, you have to plead facts to show that's what the price is. And what the argument or what the trial judge apparently, I'm trying to read the trial judge's ruling, and what the trial judge is saying is that it's not there. It's a fact pleading state. I've read your complaint. The attachments are now part of the complaint. I've read the attachments. I still can't figure out what the final price was. And if I can't figure it out, it's a fact pleading state, 6-15 is the appropriate remedy. Well, if that's true, then I think we at least get a second bite at the apple here. I think it's a drastic remedy to throw us out the door saying I need more detail on that one particular item. Does that further the interests of justice? I don't think it does. I think that's the other issue we have here. Dismissing with prejudice seems to be a drastic remedy. And if the court, that was the other problem, the court retired the day after he issued the decision, so we couldn't go back and find out what he was really thinking. So the whole thing suddenly ended, and we're left with what we're left with. And it would seem to me a second amended complaint would be perfectly logical here, and that's we're asking this court to reverse to the least lowest or refile. If that's what we have to address, then certainly we will. But clearly we've met the burden everywhere else if we haven't met that burden. I think it's a drastic remedy to throw us out of court at an early time. Was the June 30th date contained in the documents that were attached to the complaint? We've attached everything to the basis for our claim. You didn't answer my question. I believe it is. I think we've attached everything there. Do you believe that the June 30th date is contained in the documents or the written contracts that were attached to your pleadings? I believe that the table we included was manufactured by us to show how all that worked. That's my document. No, that is what I'm asking. Mr. Trott, are you done asking questions? No, I'm going to go. Okay, go ahead. Let's say I enter into an agreement with you, you're going to buy a widget for $1. So we enter a contract that says you're going to buy a widget for $1, and I don't pay you after you give me the widget. If you attach the contract to your complaint and the contract indicates that the price of the widget was $1, you can't allege in your complaint that the widget cost $2. The attachment is superior to your pleadings. And if you plead and attach a document, then you are required to plead in conformity with that document, and any nonconformity is deemed to be superseded by the document. So what I was trying to get to when I asked you the question was, having attached the document to your pleadings, did the pleadings contain the June 30th date in, pardon me, not the pleadings, the contracts or the attachments contain the June 30th date anywhere? To the best of my knowledge, Your Honor, they do, yes. They do? I believe they do. Because you originally said that the June 30th date was contained in a document that you constructed or reconstructed or manufactured as the receiver or the S&E of the accounts receivable. What we tried to do with that table was to take the attachments and show what happened when the grain was delivered and what was paid and what was deducted and what not to show what the balance is that's left. And that's the basis for the claim. The contract in 208, the last date on Paul Cheesman, contract number 208, the last date on all these dates that are scratched out and new dates put in is February 28th of 2000. So between the time the grain was delivered and February 28th of 2000, there should have been some price set in there. And then now the last little sheet you attached here, which you base your little table on, is from June of 2000, June 30th of 2000. So I'm just getting back to Justice McClainer's question. If the contract says the last date you can set a price is February 28th of 2000 and you're now setting it at June 30th of 2000, how do we get there? I'm not looking at that document, obviously, that you are, but I believe the amendments would conform with having the date that's determined at the end of the day. But without seeing that specific document, Your Honor, I believe we were consistent with it. But the same point is if there's a problem setting that, it seems to me that giving us the opportunity to replete, to cure that problem, is entirely reasonable and supports the interest of justice that we should have. There's a lot of money involved here, and my client took the biggest loss in this failure of anybody. And if we need to clean that up, I think it isn't unusual that a second amended complaint would be filed. My question goes to yet another amended complaint, or let's say a second amended complaint. Do you believe that the trial judge, our last trial judge would be Judge Spranglemeyer, considered that there had been previous complaints in this case? I absolutely think he did, and I think that's error. That has nothing to do with this case. That case was properly, voluntarily dismissed, and in fact we went through the motion to substitute judge, Judge Gunnarsson, who ruled that it's a new case, and he recused himself. I don't know that it's a new case for purposes of the number of pleadings filed. Do you have some authority for that proposition? I didn't make the argument that Mr. Thurston did, and I don't think he has any authority that it does. My concern is, is the case in 2001, even if it does apply here, it shows at that point that we were able to plead a case against these individuals, and they filed answers, and to say that we've tried four or five times and haven't been able to plead a case against these people is simply not true. The 2001 cases support me. They don't hurt me. They show these people recognize that they had to deal with the issue, and they filed answers with affirmative defenses. But they moved to withdraw the answers, and that's what led to the SOJ, because they moved to withdraw the answers, and then as the judge was ruling on the motion to withdraw the answers, he made all kinds of other rulings, and that led to the SOJ. That's when they sought to have Judge Joyce removed, which he did. So they moved to withdraw the answers? They moved to withdraw the answers because they wanted to raise the issue of the CNS grain case as being controlling, and we were able to show that it has nothing to do with this case because the grain had already been delivered. So at that point, they couldn't withdraw the answers. They were there. The fact of the matter is they did file a motion for summary judgment in the 2001 cases, and, in fact, those were pending when we filed a motion to voluntarily dismiss, and the fact is they had every right to demand that those motions be heard before our voluntary dismissal motion was heard, and they waived that. They did not do it. They did not do it. So we dismissed per Illinois law, and if they left something on the table at that point, they did. But I think the cases are, if they wanted to press ahead to have their motions heard at that point, they could have, but they waived it. So we dismissed and we refiled properly. We followed Illinois completely in refiling. We did it timely and properly. Any other questions? Thank you, sir. You'll have a chance to make rebuttal later on. Mr. Thurston? Thank you, Your Honor. May it please the Court, good morning. Good morning. I would like to just add one fact that wasn't discussed, but it's evidently obvious from the case and the argument, and that is this case really is, the 2006 case, the same case as the 2001 case. The fact that, and Your Honor picked up on this already, that the fact that Judge Gunnarsson ruled that it was a new case was purely for purposes of whether or not a substitution of judge could be taken or not. It was not a ruling on whether or not any subsequent judge or Judge Gunnarsson could look at prior pleadings. And what this case really comes down to, Your Honor, is that there is no meaning of the minds here, and it hasn't been pled by the plaintiff, and I don't believe it can ever be pleaded by the plaintiff. I don't care if we get into a 4th, 5th, 6th amendment of the complaint. We'll never get there, and let me highlight some of the reasons for that. Okay. As has been stated already by this Court, this is a fact pleading jurisdiction. Illinois, we want facts. This isn't federal court where notice pleading is there, and the argument of whether or not notice pleading has even gone away in federal court. We in Illinois are clearly a fact pleading state. Now, Your Honor asked a question, and I think it very gets to the point. Is this an account-stated cause of action, or is this a breach of contract cause of action? And it's clearly a breach of contract cause of action. And it's interesting to note, Your Honors, is that if you look at the four versions of the complaint, if you will, the first version starts off as a breach of contract. Now, it was dismissed mostly because it didn't follow the idea that you could plead the separate contracts and separate counts. So, plaintiff comes back and repleads in that 2001 case, okay, we'll plead it as separate counts. Okay. That case proceeds along. Then it's voluntarily dismissed. Now, the critical point is if you look at the new complaint in 2006, all of a sudden it looks more like an account stated. They talk more in terms of account stated. These accounts, the defendants participate in some price marketing program, and this is exactly what the basis of this debt is. But then they kind of sneak in there some contract language. Well, and then I think what happened was when the first version of the complaint, 2006, was dismissed, the judge picked up on that and said, well, this is really a contract case, not an account stated case. And so now you're under the burden of pleading a breach of contracts case. And obviously, one of the key elements is, is there a contract? And part of that is an offer and an acceptance and a meeting of the minds in those terms in order to form the contract. That is the critical point, Your Honors, that plaintiff has never gotten to. And they never will. Because, as you pointed out, most of the contracts, which control what the cause of action is, have all kinds of markings on them. We can't determine, well, was there, you know, what the date is, what the price is. And probably, I'm sorry. Let me interrupt you and ask the question. What would have happened if they had alleged that the date certain was February 28th? Of each, the date on each separate contract? The last date of each separate contract instead of their own date. Well, we don't know that, Your Honor, because they have taken the position that these contracts were ruled. So I don't know. Because, again, Your Honor, they have not even indicated that the documents support those dates. Well, what I mean is if it was the 28th or a different date on the other contracts, would your clients have ended up being entitled to more money or less money, or is it capable of computation? It's capable of computation, sure. We can go to what the market price was on that date of when. This is how these contracts work. You look at the market price on that date of when the contract is supposed to terminate. And you can figure out, okay, what was paid, what's the market price, so now is there any difference between what was paid and what the market price is. So, yes, to answer your question, there is a way to determine the price and the amount. But the problem with that is, Your Honor, we don't know. The plaintiff says that there's all these amendments and all these rollovers and so forth, which my clients don't know anything about. I mean, these are fabrications. And what happens is, and we get to one of the questions you raised before, which was the arbitrariness of picking August 11th, the date of closure, or June 30th, as their table does. I mean, and I'm not quite sure, Your Honors, which date they are actually using, because in one of their, actually in the motion to reconsider, they argued it was the date the granary closed, which was August 11th of 2000, which is two months after the date they indicate on that chart, which is June 30th. So I'm not sure even they're even clear on what date is supposed to be picked. But if we say, okay, we're going to pick the August 11th date, the date the granary was closed, well, again, it gets to how arbitrary that is. Because, first of all, there's no indication that that's the date the contract picked. Second of all, what if, for example, the market went up? Because apparently the market was going down. And that's where there are allegations that my clients owe more money, because the market was going down, and on the August 11th date, the price was very low. But now, here's where that arbitrary date becomes unfair, and not any basis in contract. What if the market all of a sudden shot up after that? And some of these contracts were still executory, such that we're in September or October, and also the price is way high. Now they're making money. Well, now the granary owes the money. And the granary is also going to make a profit from that as well. So that's why this can never be pleaded as a breach of contract case, which is what it is, allegedly. So they can't meet their pleading burden. They haven't done so. And a critical fact to this, Your Honor, and it was just one of the last questions that was discussed, which was whether or not you can look at these prior pleadings, okay, to determine that this first amended complaint in the 2006 case should be dismissed with prejudice. The key issue there is that we can look at those prior amendments. It's an abuse of discretion standard, whether or not the trial judge feels that further amendments can be allowed. Judge Brengelmeyer clearly felt that further amendments were going to do no good. In fact, he used the language that you're not going to be able to cure these faults. Even if you could cure them, it still doesn't make any sense. And there's a case, Your Honor, and I apologize for not putting it in my pleadings, but I'll give you the citation. Thomas v. Davenport, 554 Northeast 2nd, 604, 196 Illap 3rd, 1042. It's from the 1st District in 1990. But it's basically stating the general case, general law, which is amendments to a pleading should not ordinarily be permitted to set up matters, which the pleader had full knowledge of at the time of filing the original pleading, where no excuse is presented for not putting its substance in the original pleading. All right, well, what's the point? The point is this, that certainly the complaints were filed in 2001. The granary was closed in 2000. So within a year's time from that very first pleading, they certainly should have known the dates, the prices, whether or not these were agreed to. All those factors should have been known. They shouldn't be given additional time after now eight years to keep pleading, repleting, and repleting to make up something that they really should have known and probably did know at the time of the original pleading. And as you noted, in the motion of reconsideration, they attached to that a proposed second amended complaint. It's very interesting because that's the very first time that they start talking about this 2000 date when the Illinois Department of Agriculture shut them down, that that's now the date that should be picked to price these contracts out. Well, okay, why is that all of a sudden known for the first time seven, eight years after these events all took place? This court should not allow, and Judge Sprengenmaier figured it should not be allowed, them to get another opportunity to plead when really they've had four times. Or even if you want to take the case that they've now pleaded a complaint and a first amended complaint, they shouldn't get the opportunity to plead even a third time. From my client's perspective, it's a fifth time because it's the same clients, the same alleged contracts, the same cost of action, and it's still their dollar on the line here that they should go back. But even if it's a third time, Your Honors, they shouldn't be allowed to because this is something they certainly should have known in 2001, but absolutely should have known when they repleted it in 2006. Do you want to comment on the differences between the cleanliness of your client's documentation versus the markings on the copies that the plaintiff has? Well, yes, Your Honor, I thank you for that. I believe that that shows that there, again, gets to the fact that there could be no meeting of the minds. They cannot show that there's any meeting of the minds because there's no, for example, initials or signatures that verify that these changes, alterations, whatever they are, there's no indication of who made those changes, whether those changes were ever approved, whether my clients ever agreed to them or if these were amendments or modifications. There's no evidence to that. My clients saw these contracts what they were. Now, you know, the plaintiffs claim all these were rolled over. Well, again, that also wasn't pleaded. It wasn't explained in their pleadings anywhere, really, how this process worked and how these amendments were agreed to. And, therefore, they can never even establish the existence of contracts, let alone any breach of contract. The contract's called for the sellers to be able to pick the price within this window from the time of delivery of the grain until at first it was one date and then all these others. So your clients were able to pick the price in this window, and then if the window closed, you know, if that date came, then it would be on that date, that ending date, correct? That's correct, yes. That's correct. And the last, like I said, the last couple of these that look like at least the one I'm looking at right now, it's February 28th of 2000. Is there anything in the record to show that the grainery was in business in February of 2000? Yes. Anything to show that they called these things due on that date? Well, we're getting into actually the substance of the case. Anything in the record? There's nothing in the record. In the pleadings? There's nothing in the record that shows that those were terminated. So by their course of dealing then, I mean, you could make an argument that the course of dealing were these things were just going to keep rolling over until somebody called them due. But they can't be, Your Honor, and that's the problem here. These are heavily regulated contracts. You can't just all of a sudden say, okay, course of dealing, because course of dealing doesn't deal here. We're not dealing with merchant and merchant. We're dealing with a merchant and a customer, farmers, who are not sophisticated in futures trading. They're not sophisticated in any of these acts. They want to sell their grain, and actually the purpose of what these grain contracts are all about answers your question, and that is the purpose of these is to hedge. In other words, farmers can't afford, they have too many risks as it is. They have weather and so forth that are already risks built into their business model. They can't afford that the market price is going to be that much of a risk. So they enter into these contracts with the idea that, okay, if the market goes up, I need to make that extra money. If the market goes down, well, then comes in your question, I better put my stop in right now, because before it gets any worse and I start losing any more money, okay? And so they're in this for a hedge. Nowhere in here is there any indication that they agreed to take on the risk of hundreds of thousands of dollars. I mean, anybody who's got any common sense wouldn't do that, especially farmers who are already facing immense risks as it is. So there's no explanation even for how these changes, and there can be no course of dealing that would amend these contracts. They need to be amended like any other proper contract. If you and I entered into a contract to buy my car, it was $6,500. You took it out for a spin, took it to your mechanic, said, you know what, this has got a breakdown in it. Well, okay, you come back to me and say, you know what, it's going to cost me $500 to fix it, so let's lower the price to $6,000. Well, fine, then you and I, we strike out $6,500 or we write $6,000 and we both sign or initial it. Well, okay, I can't sit there and say, you know, well, you're grumbling about $500. I'm going to write into the contract $6,250. I'm going to only give them $250. I can't do that unilaterally. That's just not the way it works here. And it especially doesn't work when you've got, you don't have merchants. That's a course of dealing is a merchant and merchant, and they've been dealing with this all along. So that's not a way to solve the problem we've got here. I'm going back to the amendment, a possible amendment. Okay. Because in the last three paragraphs of Judge Springer-Meyer's disposition, he says, Finally, this court is of the opinion that even should the apparent infirmary somehow be able to be cured by recasting the pleading, supplementing the exhibits, or presenting testimony by deposition or affidavit, it is still manifestly unjust for this litigation to continue. And then he talks about that these defendants have been embroiled in lawsuits with negative consequences. But then in the very next paragraph, there is no characterization of the transactions presented by the pleadings and exhibits here, and that I think is a critical word, that can convert a 1997 sale of grain to a $100,000 debt in 2008. He seems to say in the first paragraph I read, they can't do it. There's no way they could do it. But then in that next paragraph, he seems to say here, I think he, doesn't that seem to open a door that they could do something that might be able to fairly deal with the contracts that are before, well, at the time of the court or between the parties? Well, I think maybe Judge Springer-Meyer was trying to be fair, to be honest. I don't think he really felt that there was any way to cure this. He was maybe offering one way, should some appellate court overrule him, that there was some way to cure this. But I think he truly was thinking in terms of an abusive discretion basis as far as whether they could replete this, and thinking, okay, you know, there doesn't seem to be any way to cure it. They haven't shown anything. The documents that are attached to the pleadings don't in any way match up with what's being pled here. So I don't see any way to cure this. Maybe perhaps there's some, you know, ephemeral way to cure this. But I think maybe he was in a way throwing a bone, so to speak, to the plaintiff to say, look, I'm going to show you that I'm being fair, that I've actually looked at the pleadings, I've looked at the documents, and I can't come up with any even remote way that you're going to be able to cure this. But yet he dismissed it with prejudice. So, I mean, in the language you may be saying there's something out there, but I can't see it, so I'm going to dismiss it with prejudice. Well, I think, though, I think he, again, I don't think he really truly believed there was any way to cure this. I mean, his language is pretty strong in that. And I think the language of the manifest injustice, which has been picked up by plaintiff in the brief, is somehow going to the 2615 dismissal. I don't think that's – I think that language goes to the – whether or not he was going to allow an amendment to the pleading, and that's the abuse of discretion. And I don't think that Judge Spangenmeier abused his discretion. What's your response to Mr. Lindstrom's argument that this was something that should not have been granted under a 2615? I believe I then asked something as to whether or not it was more in the nature of a summary judgment motion whereby the plaintiff is required to arguably present a situation that would entitle the plaintiff to judgment. Yeah, we get back to just the basic premise here, Your Honor, and that is this is a fact-pleading jurisdiction. And I think Judge Spangenmeier did a great job of looking at this and saying, is there any way to plead this to survive a 615 motion? And I believe he came to the conclusion that no, it could not, because for the very reasons that the key elements, offer and acceptance, meeting of the minds, will never be able to be even pled, let alone proven. But we're not to that point. We're at the 615 stage where he's looking at the pleadings and saying, you know, you show me your documents, you show me your pleading, you're never going to get there. If there's never a meeting of the minds, then very often what pops up is whether or not there should be rescission of whatever it was that was not ever completely completed. Was there any evidence of any prayer or attempt to obtain rescission? Not that I've seen. Not on the record, Your Honor. Well, if there were, how would the parties be placed in status quo ante? Well, that's almost an impossible question to answer, Your Honor, because of the failure of the greenery. Because State Bank sits us as a creditor trying to seek to recover an account receivable, you're now taking it one more step out, which is, okay, how do we rescind that contract? How does that work? We don't know, Your Honor. To give you an example of why that's impossible to figure out, the 8% that you mentioned before, to my client's knowledge, the greenery retained 20% of their money. What happened to that money? My clients were never repaid that money. So, you know, we have almost an impossible, and I believe that money is gone. I mean, there's actually a pending criminal procedure right now that's dealing with where the money is from this grain operation. And so I think the money's gone. So to rescind, what you're talking about is, okay, some people have to be refunded money, some people would have to be refunded money. And I frankly think that's why it was never pled, because it's just an impossible proposition.  Any other questions? Thank you, Your Honors. And I just, final remark is that I request that the trial court's decision to dismiss this matter be affirmed. Thank you very much. Thank you. Mr. Lindstrom. To reiterate, Judge Springlemeyer's decision shows that, in his view, the only thing missing from his view is the matter of price. And this is a regulated business by the state of Illinois, and I think we need to recognize that. And it's not like the corner appliance store failing. It's a regulated business. That does impact what goes on here. Indeed, if there was a price in these contracts and the business failed, then the date on those contracts isn't going to make any difference, because they, Your Honor, spoke a moment ago of the window to fix the price. That window gets shortened if the business fails. And the date could, if the date is September of 2000 and the elevator failed in October, the price is going to get fixed because the company's out of business. That's a factor. Why do you say that? I don't quite. Because the business, the granary goes out of business. The unpriced grain has to get priced. If it goes out of business, then maybe it's breached its contract, and the other party has the right to set the date pursuant to the contract. And if the date happens to be a date after the granary goes out of business and on that date there is a profit to be made such that the granary owes them additional monies, they may not be able to realize that if the granary goes bankrupt and doesn't have sufficient funds. But I don't see any citation that you've given us that would indicate that the fact that the granary went out of business, that there was a term in the contract that indicated that if it does go out of business, then this is the date that is to be determined as the date that the parties agreed would be the date at which the price would be set. Is there a clause in the contract to that effect? No. Well, then why are you claiming that that is supposedly part of the contract? Because it's a regulated business. If it's not doing business, if the granary breached the contract by failing, as Your Honor just pointed out, to me that's a defense. What does the fact that it's regulated have to do with the price of corn in China? I don't understand. I'm not well versed in regulation of licensed granaries, so I'm not aware of anything that says that because it's regulated that there's some authority that says that what you're saying is correct. Well, I guess that's going to be a matter of evidence. But if the regulated business fails, the grain has got to get priced. The State of Illinois takes over, they liquidate the assets, and they pay people who are owed money. If these grain producers were owed money at that point, which Cheeseman and Dahlmer thought they were, they can get paid on their contract. But if they owe money to the licensee, the granary, then they need to pay that money. If that's the case, then shouldn't the State of Illinois also comply with the terms of the contract? Otherwise, the State of Illinois is breaching the contract as well. Sure. But in this case, my client had a lien on those assets, so it was left to us. But they processed the claim these two gentlemen filed and determined, no, you're not owed money, you owe money to the granary. The fact that you have a lien doesn't indicate or establish that you have the right to set the date upon which the other party, who has the right to set the date, to determine what the prices are. I think it's a reasonable date if the regulated company is out of business. How can it be reasonable if it's not included in the contract and the date that's supposed to be determined is the prerogative of the other side? Where does your client think that it has the right to pick the date when the contract seems to suggest that picking the date is the other party's right? I think that's a defense, Your Honor. No, that's not a defense. That's frivolous pleading is what that is. I guess I differ there. I don't think it is. How can you claim that your client has the right to pick a date when the contract says to the contrary? Are you claiming that the other side was committing fraud? I don't think anybody committed fraud here. They misrepresented the contract and that your client has the right despite what the contract says? I don't believe anybody committed fraud here, Your Honor. But I also don't believe that these are contracts that can be interpreted by the grain producers as heads I win, tail you lose. And that's what it comes to at the end of the day. The key factor for us, and then I'll conclude here. I think I've probably overused my time. I've been at this over 30 years, and I've seen it in grain elevators and other businesses. I've never been in a situation where, for each contract situation, the plaintiff's only been given two opportunities to plead. And I think if the ends of justice would at least give this plaintiff the opportunity to address the issue of price in a second amended complaint, I think it's reasonable here. And I think it's a drastic remedy to dismiss with prejudice. Thank you. Very well. We have other cases.